2019 UT App 66

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BLAKE REES WRIGHT,
Appellant.

Opinion
No. 20150153-CA
Filed April 25, 2019

Fourth District Court, Nephi Department
The Honorable James R. Taylor
No. 111600138

Nathan E. Burdsal, Robert C. Avery, and
Hutch U. Fale, Attorneys for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES KATE APPLEBY and RYAN M. HARRIS concurred.

ORME, Judge:

¶1      Defendant Blake Rees Wright challenges his guilty plea to aggravated kidnapping, a first-degree felony; attempted murder and aggravated elder abuse, both second-degree felonies; and obstruction of justice, witness retaliation, possession of ammunition in a correctional facility, unlawful discharge of a firearm, and possession of a firearm by a restricted person, all third-degree felonies. Defendant argues, among other things, that his trial counsel provided ineffective assistance. Apart from his aggravated kidnapping conviction, which we vacate and in connection with which we remand for further proceedings, we affirm his convictions and deny his request to withdraw his guilty pleas.

BACKGROUND

*The Assault*

¶2   Defendant, who lived with his mother (Mother), instigated an argument with her about whether she had been interfering with his prescription medications and telling other people that he, a convicted felon, had access to a gun. Defendant recorded the altercation with a video camera, apparently for the purpose of making a video record of her "lies."

¶3   A few minutes into the argument, Mother stood up, intending to leave, but Defendant pushed her back into her chair. Mother and Defendant continued to argue, and Defendant told Mother that he "could fuckin' put a bullet in [her] fuckin' head and not even think twice about it." Mother admitted that she had told someone that he had a gun. She then shoved Defendant, knocking the video camera out of his hands. Although Defendant and Mother are no longer visible on the recording, a subsequent assault can be heard in the background.

¶4   Mother testified that Defendant hit her "hard" with "both hands" for what "felt like forever." He also put her in a headlock and squeezed her until it "felt like something was breaking." After releasing Mother, Defendant took a piece of glass from a coffee table that had been broken during the attack and brandished it over Mother, making her think it was "all over." In the video recording, Defendant is heard saying, "You, fuckin', you oughta get your fuckin' hands off you old bitch or I'll fuckin' kill you, to death. I'll choke you to death." As Mother pleads with Defendant to stop, he tells her he is going to "beat [her] to death," "kill [her]," and that the beating was "just a taste [of] what [she was] going to get." Defendant then stops the recording.

¶5   For a few hours, Defendant left Mother alone and the two were not together. But once again Defendant became upset with

Mother for interfering with his prescription medications. Defendant then got a gun, pointed it at her head and ordered her to call 911. He told her he was "not kidding around" and he "could shoot [her] leg," and then he shot two bullets into the floor. Subsequently, Defendant grabbed Mother by the legs and pulled her out of the chair. She fell to the floor and "could hear" her ribs cracking. Mother eventually got back on the chair and stayed there "because it was so painful that [she] couldn't do anything else."

¶6     Unable to tolerate the pain anymore, Mother asked Defendant to open the garage door so that she could go to the hospital. She asked him three times to open the garage door before he complied with her request. Before Mother left, Defendant asked her what she was going to say at the hospital, and she told him that she would tell the hospital staff she fell off the cement steps.

¶7     Defendant followed Mother to the hospital. Approaching her in the emergency room area, he lifted up his coat "to show [her] that he had [a] gun." When the emergency room doctor (First Doctor) examined Mother, she told him that she had fallen off the front porch steps. First Doctor recommended that Mother stay the night, but Mother was worried that Defendant would hurt other people, so she returned home.

¶8     The next day, when her daughter picked her up, Mother told her that Defendant had attacked and "pistol whipped" her. After a few days at her daughter's home, Mother was still in a lot of pain and returned to the hospital. A doctor (Second Doctor) examined her and determined that she had a subdural hematoma and edema—bleeding between the brain and the skull and swelling of the brain. Another doctor confirmed the diagnosis with an MRI that showed a subdural hematoma and "[shear] injury" to Mother's brain. Mother also had a bruised spleen and four broken ribs.

¶9     Officers arrested Defendant. Defendant, smiling at an officer said, "You guys didn't even find the gun, did you?" But officers found a fully loaded .22 caliber gun hidden at the house, and Defendant unsuccessfully tried to dispose of .22 caliber ammunition at the jail. Defendant's sister later found the video recording and turned it over to the police. Defendant was charged as noted above, *see supra* ¶ 1, and the case proceeded to trial.

*The Trial*

¶10     On the first day of trial, Defendant requested a continuance, seeking new counsel. The district court, unaware of any conflict between Defendant and his counsel (Trial Counsel), asked Trial Counsel about the conflict. Trial Counsel replied that it would be better for "additional counsel [to] come in the case," based on the "complexity of the case" and given the number of counts and his "relationship with [Defendant]." Trial Counsel indicated that Defendant "want[ed him] to continue to work on the case" and appreciated counsel's efforts, but Defendant wanted "an attorney of his own that he's selected to join in and be lead counsel." The State pointed out that Trial Counsel was a "very experienced attorney" who had "tried a number of very difficult cases" that were "much more complicated and much more serious than" Defendant's case, and he had the necessary skill and experience to try the case on his own. The court denied the continuance request, stating that Defendant should have made the request "months ago" instead of on the first day of trial. It also denied Trial Counsel's request for additional counsel.

¶11     Three days into the trial, and after having viewed the video recording made by Defendant, the jury heard detailed testimony from Mother about the assault. After Mother's testimony, Trial Counsel requested additional time during the break. After returning from this break, the parties

announced that Defendant would plead guilty as charged, but the State would amend the aggravated kidnapping count by removing the serious bodily injury allegation which would reduce the maximum sentence from life without parole to 15 years to life. *See* Utah Code Ann. § 76-5-302(3)(a)–(b) (LexisNexis 2017).

¶12   Defendant signed a plea statement, listing the rights that he was waiving, including his right to a trial at which the State would have "the burden of proving, beyond a reasonable doubt, what are called 'elements' of the offense (or offenses) charged." The district court conducted a plea colloquy to ensure that Defendant understood his guilty plea. During the colloquy, Defendant acknowledged that he had read and understood the plea agreement and the rights he was waiving, had no questions about it and required no further explanation of it, and was "acting freely and voluntarily" in entering his guilty plea.

*The Plea Withdrawal Hearing*

¶13   A few days later, Defendant wrote a letter to the district court seeking to withdraw his guilty plea. Although the pro se motion was filed before sentencing, the district court failed to address it and proceeded with sentencing. Defendant appealed and this court summarily reversed Defendant's sentence and remanded the matter to the district court to address the motion. *See id.* § 77-13-6(2)(b).

¶14   On remand, Defendant was appointed new counsel and granted leave to amend his motion to withdraw his guilty plea. In his amended motion, Defendant argued that his plea was not made knowingly or voluntarily and that Trial Counsel provided ineffective assistance. In an evidentiary hearing on these issues, Defendant testified that he pled guilty because Trial Counsel was unprepared for trial and he felt forced to take the plea deal. But Trial Counsel contradicted this testimony, stating that he

had met with Defendant multiple times, interviewed the witnesses, visited the crime scene, and reviewed the evidence. Trial Counsel further testified that, after Mother testified at trial, Defendant did not want her to be cross-examined because "she'd been through enough" and Defendant had seen "the entire jury was in tears." Defendant also told Trial Counsel that he was "going to be convicted," a conclusion with which Trial Counsel apparently did not disagree. Trial Counsel then asked Defendant if he wanted to seek a plea deal, and Defendant told him that he did.

¶15 The district court determined that Trial Counsel's testimony was more consistent with the record and that Defendant's testimony was self-serving and "was contradicted by the record." Based on that determination, the court found that Defendant was the one who sought a plea agreement, not Trial Counsel, and that he was not "coerced or compelled to accept a plea bargain." It also concluded that the record established that Defendant entered his plea knowingly and voluntarily and that Trial Counsel's performance "was not deficient" nor prejudicial to Defendant.

¶16 Defendant was then sentenced to several prison terms, some running consecutively and some running concurrently. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶17 Defendant raises two arguments on appeal. He first argues that Trial Counsel provided ineffective assistance of counsel in several ways, rendering his plea unknowing and involuntary. With regard to those issues upon which the district court found facts at the plea withdrawal hearing conducted at our direction on remand following Defendant's initial appeal, our decision is informed by the court's findings of fact. *See State v. King*, 2017 UT App 43, ¶ 13, 392 P.3d 997. For those issues

upon which the district court did not find facts, we review the ineffectiveness issues for correctness, examining "whether the defendant was deprived of the effective assistance of counsel as a matter of law." *See Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587.[1]

¶18　Defendant also contends that cumulative errors made by Trial Counsel allow the withdrawal of his guilty plea. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair [proceeding] was had." *State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7 (quotation simplified).

ANALYSIS

I. Ineffective Assistance of Counsel

¶19　Defendant contends that his plea was unknowing and involuntary because he either had to "plead guilty to crimes he did not commit but have the chance of parole" or "continue with trial and assuredly be convicted without the possibility of parole." He essentially argues that Trial Counsel provided such deficient legal representation that Defendant had no choice but to plead guilty to the crimes for which he was charged, raising

---

1. In relation to one of his ineffective assistance claims, Defendant also argues that the district court failed to apply the doctrine of merger to his aggravated kidnapping charge. Because we reverse and vacate Defendant's aggravated kidnapping conviction, the issue is moot. There was a distinct possibility of merger under the common-law merger test set forth in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243, *abrogated by State v. Wilder*, 2018 UT 17, 420 P.3d 1064, but in any event, Defendant waived that argument by pleading guilty to the aggravated kidnapping charge.

six instances where Trial Counsel provided such deficient representation and one instance in which his plea withdrawal counsel did.[2]

¶20　To prevail on a claim of ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient," and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In the context of a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[3] *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). And allegations of ineffective assistance "cannot be a speculative matter" and must be firmly rooted in the record. *Nicholls v. State*, 2009 UT 12, ¶ 36, 203 P.3d 976 (quotation simplified).

A.　Failure to Obtain Independent Medical Experts

¶21　Defendant contends that Trial Counsel failed to "follow up with independent medical analysis" or call independent

---

2. Upon Defendant's request, the district court appointed new counsel to represent Defendant in the plea withdrawal hearing. He is again represented by new attorneys on the current appeal.

3. There is no requirement that he additionally show he would have received a more favorable outcome at trial. *Compare Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (requiring, in the context of a guilty plea, that a defendant show he "would not have pleaded guilty and would have insisted on going to trial"), *with Strickland v. Washington*, 466 U.S. 668, 694 (1984) (requiring a defendant, in the context of a flawed trial or other proceeding, to demonstrate that "but for counsel's unprofessional errors, the result of the proceeding would have been different").

medical experts at trial to demonstrate that Second Doctor's subdural hematoma diagnosis was incorrect. He asserts that Mother's injuries can occur "spontaneously" as a result of her age and Trial Counsel should have followed up with a medical expert to confirm this theory. Defendant raised this claim at the plea withdrawal hearing, and the district court found that Trial Counsel's decision not to call "an additional medical expert" was "a reasonable strategy choice." The court determined that "a neurologist or an additional medical expert" "would not have made a significant difference to the outcome of the case" and "Defendant has not presented any actual evidence that these additional expert witnesses would have given ground shaking testimony to contradict or undermine the testimony the medical doctors gave in this case."

¶22 Defendant does not point to evidence in the record demonstrating that the court's factual findings were clearly erroneous. On appeal, a defendant "cannot 'simply restate or review evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact.'" *Salt Lake City v. Reyes-Gutierrez*, 2017 UT App 161, ¶ 25, 405 P.3d 781 (quoting *Ostermiller v. Ostermiller*, 2010 UT 43, ¶ 20, 233 P.3d 489). "Rather, to show clear error, he must identify the supporting evidence and explain why the trial court's factual finding is nonetheless against the clear weight of the evidence." *Id.* For that reason, we defer to the district court's finding that Trial Counsel's decision not to obtain an additional medical expert was a reasonable strategic choice because Trial Counsel "could make and argue the same points using the more credible doctor witnesses the State had already subpoenaed." We conclude that Trial Counsel's decision to forgo independent medical experts does not constitute deficient performance, and Defendant's ineffective assistance of counsel claim therefore fails.

B.      Failure to View or Investigate Evidence

¶23     Defendant contends that Trial Counsel did not view or investigate critical evidence in his case. To begin with, Defendant argues that Trial Counsel did not view the video recording prior to the evidentiary hearing on his motion to suppress or otherwise before trial and that Trial Counsel's motion in support lacked "legal authority or meaningful analysis." Had it not been for these errors, Defendant argues, the motion would have been successful because his sister conducted the warrantless, nonconsensual search on behalf of the police.[4]

¶24     At the plea withdrawal hearing, Trial Counsel stated that he viewed the video with Defendant multiple times before trial. It is not clear from the record whether Trial Counsel viewed the video prior to the evidentiary hearing on the motion to suppress. Nevertheless, the motion to suppress was futile. Trial Counsel filed a supporting memorandum after the evidentiary hearing, arguing that the video recording should be suppressed given that it was the fruit of an unconstitutional search by Defendant's

---

4. Defendant also argues that the video was altered, asserting that numerous recordings were deleted from the camera. But Defendant's assertions are speculative and there is no evidence in the record that the key video was altered or establishing how deletion of the other recordings was prejudicial. At the plea withdrawal hearing, Trial Counsel testified that Defendant told him that the video had been altered, but that Defendant did not know how, only that he "felt that the police had altered" it. Defendant then told Trial Counsel that if he saw the entire video he would know how it had been altered. After the suppression hearing, where the entire video was played, Defendant no longer objected to the video and Trial Counsel assumed the issue was dropped.

sister. While the district court concluded that Defendant's sister conducted the search, it determined there was no evidence that this private search was done at the request of the police. And so, even if Trial Counsel failed to watch the video recording prior to the evidentiary hearing and his motion lacked "legal authority or meaningful analysis," it was not prejudicial to Defendant given the futility of the motion premised on his sister acting as a police agent.

¶25 Defendant next argues that Trial Counsel failed to investigate ballistic and forensic evidence, asserting that it is not possible for him to have shot the gun at the angle the State claims he did, his fingerprints were not found on the gun, and there is no evidence the gun was fired. He contends that Trial Counsel should have hired an independent expert to testify to these claimed inconsistencies. But these claims are speculative, without any basis in the record, and are insufficient to overcome the presumption that Trial Counsel provided effective assistance. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

¶26 Mother testified that Defendant shot the gun twice, which was corroborated by bullet holes found by officers in the floor. An officer also testified that upon Defendant's arrest Defendant, with a smile on his face, stated, "You guys didn't even find the gun, did you?" But officers found a .22 caliber handgun at the house, and Defendant later unsuccessfully tried to dispose of .22 caliber ammunition, overlooked by the arresting officer during the search of Defendant once he got to jail. In light of this evidence, and given Trial Counsel's testimony that he had viewed the evidence and the crime scene prior to trial, we presume Trial Counsel did not pursue ballistic and forensic experts having concluded, in his "reasonable professional judgment," *id.*, that such an exercise would be pointless. For

these reasons, Defendant's ineffective assistance of counsel claim, premised on this ground, fails.

C.     Failure to Advise Defendant on the Sufficiency of the Evidence

¶27     Defendant contends that he should be allowed to withdraw his guilty pleas to possession of ammunition in a correctional facility, attempted murder, and aggravated kidnapping because Trial Counsel "failed to provide competent legal advice" on the insufficiency of the evidence supporting these charges.

¶28     Determining that it was Defendant's request that Trial Counsel seek a plea agreement after hearing Mother's testimony and seeing the jurors in tears, the district court found that Defendant was "not coerced or compelled to accept a plea bargain." And because there was compliance with rule 11 of the Utah Rules of Criminal Procedure, including a factual basis, "provided by both the opening statement and the subsequent witnesses and exhibits that were presented to the court over two and one half days of testimony," the court concluded that Defendant "entered his pleas knowingly and voluntarily." *See* Utah R. Crim. P. 11(e)(4)(B) (requiring that the court may not accept a plea until "there is a factual basis for the plea," including "that the prosecution has sufficient evidence to establish a substantial risk of conviction").

¶29     Defendant argues that his guilty plea was not "knowing and voluntary" because Trial Counsel failed to advise him that no sufficient factual basis supported the possession of ammunition in a correctional facility, attempted murder, and aggravated kidnapping charges. *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (stating that because "a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence

demanded of attorneys in criminal cases") (quotation simplified). We address each claim in turn and conclude that Defendant's guilty plea to these charges was knowingly and voluntarily made, with the exception of his guilty plea to aggravated kidnapping where Trial Counsel erred in failing to raise any objection or to advise Defendant on the insufficient evidence supporting the element of "detention."

¶30 On an ineffective assistance of counsel claim, a convicted "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). However, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation simplified). This standard "is a most deferential one," *Harrington v. Richter*, 562 U.S. 86, 105 (2011), because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," *Strickland*, 466 U.S. at 689. Therefore, "the question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S at 105 (quotation simplified). But even supposing counsel erred, a defendant "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

1. Possession of Ammunition in a Correctional Facility

¶31 Defendant contends that Trial Counsel failed to advise him that he had an entrapment defense to the charge of possession of ammunition in a correctional facility. To prove that charge, the State had to establish that Defendant knowingly possessed the ammunition he tried to get rid of at the jail. *See*

Utah Code Ann. § 76-8-311.3(4)(d) (LexisNexis 2017). *See also id.* § 76-2-103(2) (providing that a "person acts knowingly . . . when he is aware that his conduct is reasonably certain to cause the result"). When Defendant was arrested, the arresting officer searched Defendant for weapons before taking him to jail. At the jail, officers asked Defendant to empty his pockets. He started tossing items into a garbage can, and officers discovered he was trying to dispose of .22 caliber bullets.

¶32　The State concedes that it would have been "the preferred course of action and good police practice" to have found the ammunition when Defendant was searched incident to arrest, before he arrived at the jail. But the arresting officer testified that in searching Defendant for weapons, he did not discover the .22 caliber bullets. More importantly, Defendant would have been aware he could not have ammunition in the jail because there was a sign at the entrance of the jail stating, "NO FIREARMS ALLOWED IN THE JAIL[.] This includes: Ammunition, Knives, or Chemical sprays." A second sign stated, "No Contraband Allowed In Jail[.] Any unauthorized contraband brought into this jail may result in additional charges against you. [Y]ou should make known to the jailer all possessions you bring into the jail." Defendant therefore should have notified officers that he needed to divest himself of the bullets prior to entering the jail, but he did not. Instead, he entered the jail and then tried to dispose of the .22 caliber bullets in a garbage can, presumably because he did not want officers to discover evidence linking him to the gun.

¶33　Defendant contends that officers put the ammunition in his pockets and he "attempted to dispose of the ammunition at the first opportunity." "Entrapment occurs when a peace officer . . . induces the commission of an offense . . . by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not

constitute entrapment." *Id.* § 76-2-303(1). There is no evidence in the record that the arresting officer or officers at the jail knew Defendant had ammunition with him prior to his entering the jail or that officers planted the ammunition on Defendant. There was sufficient evidence to support a conviction for possession of ammunition in a correctional facility, and we assume Trial Counsel concluded that trying an entrapment defense would not be successful. *See Harrington v. Richter*, 562 U.S. 86, 107 (2011) ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Therefore, Defendant's ineffective assistance of counsel claim on this ground also fails.

2.      Attempted Murder

¶34    Defendant argues that he could not have committed attempted murder because there is insufficient evidence to show that he intended to cause Mother serious bodily injury or death. To prove attempted murder, the State bore the burden of establishing that Defendant "engage[d] in conduct constituting a substantial step toward commission of" murder and intended to commit the crime or "act[ed] with an awareness that his conduct [was] reasonably certain to cause that result." Utah Code Ann. § 76-4-101(1) (LexisNexis 2017). *See also id.* § 76-5-203(2)(a)–(b) ("Criminal homicide constitutes murder if . . . the actor intentionally or knowingly causes the death of another [or,] intending to cause serious bodily injury to another, the actor commits an act clearly dangerous to human life that causes the death of another"); *State v. Casey*, 2003 UT 55, ¶ 38, 82 P.3d 1106 (stating that for attempted murder the State "must show that the defendant acted intentionally").

¶35    At trial, the State provided sufficient evidence that Defendant intended to kill Mother and took a "substantial step" toward doing so. Prior to and during the assault, Defendant

threatened that he would "beat [Mother] to death." He added: "I could fuckin' put a bullet in your fuckin' head and not even think twice about it. You fuckin' whore"; "You fuckin', you oughta get your fuckin' hands off you old bitch or I'll fuckin' kill you, to death. I'll choke you to death"; "I'll beat you to death"; and "Yeah, I kill you." There is nothing to suggest he was only kidding. On the contrary, he specifically told Mother that he was *not* kidding. Mother testified that Defendant hit her with both hands for what "felt like forever," put her in a headlock and choked her until it "felt like something was breaking," threatened her with a glass shard, put a gun to her head, pulled her out of her chair hard enough that she heard her ribs break, and shot two bullets into the floor. Defendant's threats established his intent to kill Mother, or so the jury might well have concluded, and he acted in a manner consistent with those threats, as Mother testified, demonstrating that Defendant "engag[ed] in conduct constituting a substantial step toward commission of the crime."[5] Utah Code Ann. § 76-4-101(1)(a). *See id.* § 76-4-101(2) (providing that "conduct constitutes a substantial step if it strongly corroborates the actor's mental state").

¶36  With the video recording and Mother's testimony, the State had sufficient evidence to establish the elements of attempted murder. And given the overwhelming evidence of Defendant's guilt on the attempted murder charge, Defendant fails to demonstrate that it would have been reasonable for him to reject a plea deal and proceed to trial on that charge.

---

5. Defendant argues there is no evidence that he attempted to kill Mother because the ballistic and forensic "evidence" is contrary to Mother's testimony. But Defendant's purported ballistic and forensic evidence is entirely speculative, and Mother's testimony and the video recording were ample evidence to support the charge of attempted murder.

Defendant's ineffective assistance of counsel claim on this ground also fails.

3.    Aggravated Kidnapping

¶37    Defendant argues that he could not have committed aggravated kidnapping because there is insufficient evidence to show he detained Mother. To prove aggravated kidnapping, the State had to establish that "in the course of committing unlawful detention or kidnapping," Defendant "possesse[d], use[d], or threaten[ed] to use a dangerous weapon," or intended "to inflict bodily injury on or to terrorize [Mother]" or "to hinder or delay the discovery of or reporting of a felony." Utah Code Ann. § 76-5-302(1) (LexisNexis 2017). As is relevant here, the Utah Code defines kidnapping and unlawful detention as detaining or restraining the victim "intentionally or knowingly, without authority of law, and against the will of the victim." *Id*. § 76-5-301(1), -304(1). And although the kidnapping statute may require the State to prove the defendant "detain[ed] or restrain[ed] the victim for any *substantial* period of time," *id*. § 76-5-301(1)(a) (emphasis added), the unlawful detention statute does not.

¶38    "[T]o demonstrate aggravated kidnapping of the unlawful detention variant, the State must show, in addition to one or more aggravating circumstances, only that the defendant unlawfully detained or restrained the victim and that he did so intentionally or knowingly." *State v. Wilder*, 2016 UT App 210, ¶ 20, 387 P.3d 512, *aff'd on other grounds*, 2018 UT 17, 420 P.3d 1064. As we determined in *Wilder*, "'detains or restrains' refers to restriction of the victim's movement, but neither definition requires . . . complete confinement or imprisonment." *Id*. ¶ 21. *See Detain*, Webster's Third New International Dictionary 616 (1993) ("to hold or keep in or as if in custody" or "to restrain [especially] from proceeding"); *Restrain*, Webster's Third New International Dictionary 1936 (1993) ("to hold (as a person) back

from some action, procedure, or course" or "to deprive of liberty"). For that reason, the State need only prove that "Defendant intentionally acted, however briefly, to impair the victim's ability to move freely." *Wilder*, 2016 UT App 210, ¶ 22.

¶39    Here, the State argues that there were two detentions: (1) Defendant pushed Mother back into the chair, and (2) Defendant would not let her leave the house to go to the hospital. We disagree with both contentions.

¶40    First, Defendant pushing Mother back into her chair is not sufficient to support a finding of detention. The push was incident to the ongoing assault. Defendant and Mother were arguing and when Mother stood up to walk away, Defendant pushed her back down into the chair. Defendant then shouted, "[W]hy did you fuckin' accuse me of stealing my Dad's stuff when I came home the other day?" The context of Defendant's action indicates that the push was assaultive rather than restrictive. *See* Utah Code Ann. § 76-5-102(1)(a) (defining assault as "an attempt, with unlawful force or violence, to do bodily injury to another"). And we are not persuaded that Defendant intended to detain Mother. The video recording displays no other actions taken by Defendant to suggest that he intended to impair Mother's ability to move. *Cf. Wilder*, 2016 UT App 210, ¶¶ 6, 22 (holding a reasonable jury could have inferred a detention occurred where the defendant followed the victim into the hallway, grabbed her hair and tried to drag her away while she locked and braced her legs between the hallway walls); *State v. Sanchez*, 2015 UT App 27, ¶¶ 14–15, 344 P.3d 191 (holding a reasonable jury could have found a detention where the defendant clearly intended to detain the victim against her will by dragging her 58 feet down a hallway and closing the door); *State v. Ellis*, 2014 UT App 185, ¶ 10, 336 P.3d 26 (holding a reasonable jury could base an aggravated kidnapping conviction on evidence that the defendant "followed [the victim] around

the house throughout the day," even following her into the bathroom to prevent her from escaping) (quotation simplified).

¶41    Second, the State argues that Defendant would not let Mother "leave the house to go to the hospital until she promised to lie about what happened." The State claims that after the assault, Mother "begged" Defendant to open the garage door, but he would not until he knew what she would say. Defendant only let her leave after knowing she would tell the hospital that she fell off the cement steps. But the record does not support these assertions, and nothing in Mother's testimony suggests that Defendant intended to "detain" Mother by not opening the garage door.

¶42    Mother testified that, after the assault, she asked Defendant three times "to open the garage door" before "he opened it." She could not recall why she did not have a garage door key herself, but she did not. When the State asked Mother, "Without him opening that garage was there a way for you to leave?" Mother replied, "I could have gone outside and there's buttons that you could push, but half the time it doesn't do it." Before Mother left the house, Defendant wanted to know what she was going to tell hospital personnel, but she gave no indication in her testimony that Defendant was preventing her from leaving the house. Instead, to prevent Mother from telling the truth, Defendant threatened Mother with a gun and followed her to the emergency room, lifting his coat to show her the gun before she met with First Doctor. And she testified that she was concerned about reporting Defendant's assault because of what he would do to his sisters if she told the truth. Because Mother never testified that Defendant prevented her from leaving the house, we conclude that Defendant did not "detain" her.

¶43    Because neither of these instances amount to a detention under the aggravated kidnapping statute, Trial Counsel was remiss in not moving to dismiss the charge after Mother's

testimony or during plea negotiations. And although Mother's testimony of the assault may have persuaded Defendant that he was "going to be convicted" and he sought a plea agreement, Trial Counsel failed to inform Defendant that an insufficient factual basis supported the aggravated kidnapping charge. Trial Counsel testified that, during plea negotiations, he did not discuss the factual basis for the aggravated kidnapping charge with Defendant because Defendant said he understood the factual basis for each element based on the State's evidence given at trial. He further testified that his advice about the aggravated kidnapping evidence occurred prior to trial. Given that the factual basis for Defendant's plea rested on the evidence presented at trial, a reasonable defense attorney would have objected to the aggravated kidnapping charge and informed his client that an insufficient factual basis supported the element of "detention." *See State v. Finlayson*, 2000 UT 10, ¶ 24, 994 P.2d 1243 (holding that the first part of the *Strickland* test had been met because the facts of the case failed to support an aggravated kidnapping conviction and defendant's counsel failed to make an objection), *abrogated on other grounds by State v. Wilder*, 2018 UT 17, 420 P.3d 1064. Had Trial Counsel done so in this case, we are confident that Defendant "would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). *See also Miller v. Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001) (stating that "the strength of the prosecutor's case" is the best evidence of whether a defendant would have in fact changed his plea). More likely, of course, had Trial Counsel considered the evidence more carefully and shared this analysis with the State, it is possible the plea arrangement would have gone forward with aggravated kidnapping off the table, given Defendant's willingness to plead to the other seven felony charges against him.

¶44 We conclude that there is sufficient evidence for Defendant's possession of ammunition in a correctional facility and attempted murder convictions, and consequently,

Defendant fails to demonstrate it would have been rational for him to withdraw his guilty plea to the charges resulting in these convictions. But, as to his aggravated kidnapping conviction, Trial Counsel erred in failing to object to the charge after Mother's testimony or during plea negotiations and in failing to advise Defendant that an insufficient factual basis supported the "detention" element of the crime. Defendant's plea to this charge was therefore unknowingly and involuntarily made, and accordingly we vacate his aggravated kidnapping conviction.

D.      Other Ineffective Assistance Claims

¶45     Defendant contends that Trial Counsel failed to preserve evidence and object to hearsay testimony and that his plea withdrawal counsel provided ineffective assistance by failing to investigate and raise substantive issues. We conclude that these issues are inadequately briefed.

¶46     Because "we are not a depository in which the appealing party may dump the burden of argument and research," we "will not address arguments that are not adequately briefed." *Johnson v. Johnson*, 2014 UT 21, ¶ 20, 330 P.3d 704 (quotation simplified). "A party *must* cite the legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case, including citations to the record where appropriate." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196 (emphasis added). And "an appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." *Boyle v. Clyde Snow & Sessions PC*, 2018 UT App 69, ¶ 11, 424 P.3d 1098 (quotation simplified). This burden "can be met only if the facts used in the argument section of the brief are sufficient to provide context for the events that occurred in the district court, are correctly shown to be in the record, and are analyzed in relation to pertinent legal authority." *Id.* ¶ 12.

¶47    Defendant makes a number of assertions with no citation to the record,[6] and he fails to engage in the analysis necessary to evaluate whether Trial Counsel's performance in these instances was deficient and prejudicial. First, he argues that Trial Counsel failed to preserve crime scene evidence, claiming that the State has an obligation to preserve exculpatory evidence and that Trial Counsel should have required the State to preserve this evidence for the defense. But Defendant fails to cite any legal authority supporting this argument and does not discuss why the absence of this evidence at trial was prejudicial to his defense.

¶48    Second, Defendant argues that Trial Counsel failed to object to obvious hearsay testimony from First and Second Doctors. Defendant argues that these witnesses did not diagnose Mother because they relied instead on the "radiologists specifically trained to read and interpret data." Defendant fails to develop any meaningful legal analysis of his arguments or of rules 801(c) and 803 of the Utah Rules of Evidence and controlling authority on this issue. And furthermore, he asserts that "[a]t worst, the evidence shows that [Defendant] slapped his mother and pulled her out of a chair," arguing that the evidence is sufficient to support a simple assault charge but not attempted

---

6. We note that Defendant's entire argument section lacks citation to the record, and he asserts a number of facts without any citation to the record. Rule 24 of the Utah Rules of Appellate Procedure requires that the argument section of a brief contain "reasoned analysis supported by citations to legal authority and the record," Utah R. App. P. 24(a)(8), because it is "not our obligation . . . to comb the record for evidence," *In re W.A.*, 2002 UT 127, ¶ 45, 63 P.3d 607 (quotation simplified). Although Defendant's statement of facts contains sufficient citation to the record, such citation does not relieve Defendant of his burden to demonstrate that the record also supports his assertions in the argument section.

murder or aggravated assault. But Defendant was not convicted of aggravated assault, and as we discussed above, the video recording and Mother's testimony constituted sufficient evidence to support the attempted murder conviction. *See supra* ¶¶ 34–36.

¶49    Finally, Defendant argues that his plea withdrawal counsel "failed to adequately question [Trial Counsel's] credibility" and "failed to establish that [Trial Counsel] was highly motivated to get a guilty plea." But the focus of Defendant's argument is on Trial Counsel's errors, not those of his plea withdrawal counsel, and in framing the argument this way, he fails to engage in a meaningful analysis of these ineffective assistance claims. Because Defendant fails to adequately brief these claims, he fails in his burden of persuasion, and we decline to address them further.

## II. Cumulative Error

¶50    Defendant contends that the cumulative prejudicial effect of his ineffective assistance of counsel claims undermines confidence in his guilty plea, and we should therefore reverse his convictions. However, "[i]f [we] determine[] that either a party's claim did not amount to an error, or that the claim was an error but has no potential to cause harm on its own, the claim cannot weigh in favor of reversal under the cumulative effects test." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038.

¶51    Defendant did not demonstrate prejudice on six of his ineffective assistance of counsel claims, and although we concluded that Trial Counsel's failure to object to the aggravated kidnapping charge given the State's insufficient evidence supporting the element of "detention" prejudiced his defense, this does not undermine his guilty plea to the other charges. Accordingly, there was no cumulative error in this case.

CONCLUSION

¶52    We affirm Defendant's convictions and conclude that his guilty pleas were knowingly and voluntarily made, with the exception of the plea culminating in his aggravated kidnapping conviction. We vacate that conviction and remand for trial or such other proceedings as may now be in order.

———————